111 P.3d 12

STATE of Hawai'i, Plaintiff–Appellee,

v.

James Franklin SOLOMON, Jr.,
Defendant–Appellant.

No. 24470.

Supreme Court of Hawai'i.

April 29, 2005.

118

James S. Tabe, Deputy Public Defender, for defendant-appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant James Franklin Solomon, Jr. (Solomon) appeals from the May 4, 2001 order of the family court of the first circuit, the Honorable Michael D. Wilson presiding, convicting Solomon of abuse of a family or household member, in violation of Hawaiʻi Revised Statutes (HRS) § 709–906 (Supp.2001),[1] and sentencing him to one year probation, subject to the conditions that he (1) pay a $50.00 criminal injuries compensation fee, and (2) undergo (a) domestic violence intervention/anger management, (b) parenting classes, (c) sex offender evaluation and treatment, if necessary, and (d) mental health evaluation and treatment, if necessary. On appeal, Solomon argues that (1) the family court's acceptance of his guilty plea without an affirmative showing that he voluntarily, intelligently, and knowingly pled guilty constituted an abuse of discretion amounting to plain error, (2) the family court abused its discretion when it ordered him to undergo sex offender evaluation and treatment as a condition of his probation sentence, and (3) the imposition of sex offender treatment constituted cruel and unusual punishment, in violation of the eighth amendment to the United States Constitution[2] and article I, section 12 of the Hawaiʻi Constitution.[3] The State of Hawaiʻi [hereinafter, "the prosecution"] concedes that the record is insufficient to affirmatively show that Solomon's guilty plea was knowing and voluntary, but argues that the family court did not abuse its discretion by sentencing Solomon to undergo sex offender evaluation and treatment, and, moreover, that such sentence did not constitute cruel and unusual punishment.

---

1. At the time Solomon committed the offense charged, HRS § 709–906 provided, in relevant part:

(1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.

For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

. . . .

(5) Abuse of family or household member and refusal to comply with the lawful order of a police officer under subsection (4) are misdemeanors and the person shall be sentenced as follows:

(a) For the first offense the person shall serve a minimum jail sentence of forty-eight hours; and

(b) For a second offense and any other subsequent offense that occurs within one year of the previous offense, the person shall be termed a "repeat offender" and serve a minimum jail sentence of thirty days.

Upon conviction and sentencing of the defendant, the court shall order that the defendant immediately be incarcerated to serve the mandatory minimum sentence imposed; provided that the defendant may be admitted to bail pending appeal pursuant to chapter 804. The court may stay the imposition of the sentence if special circumstances exist.

(6) Whenever a court sentences a person pursuant to subsection (5), it also shall require that the offender undergo any available domestic violence intervention programs ordered by the court. However, the court may suspend any portion of a jail sentence, except for the mandatory sentences under subsection (5)(a) and (b), upon the condition that the defendant remain arrest-free and conviction-free or complete court-ordered intervention.

(7) For any subsequent offense occurring within two years after a second misdemeanor conviction, the person shall be charged with a class C felony.

. . . .

In 2002, the legislature amended HRS § 709–906(5)(b) to provide that a person shall be deemed a "repeat offender" if they commit a second offense of abuse of a family or household member within one year of the "first conviction." See 2002 Haw. Sess. L. Act 5, § 1 at 54. The legislature further amended HRS § 709–906(7) to provide that, for the "third or any subsequent offense" of abuse of a family or household member occurring "within two years of a second or subsequent conviction, the person shall be charged with a class C felony." See 2002 Haw. Sess. L. Act 5, § 1 at 54. However, because the subject incident occurred on February 22, 2001, the amended version of the statute is not implicated in the present matter.

2. The eighth amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

3. Article I, section 12 of the Hawaiʻi Constitution provides, in relevant part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

Inasmuch as the record fails to affirmatively demonstrate that Solomon's guilty plea was knowing and voluntary, we vacate Solomon's conviction and sentence, and remand to the family court for a new change of plea hearing. Although this issue is outcome-dispositive of the instant appeal, we address Solomon's remaining points of error in order to provide guidance to the family court on remand.

## I. BACKGROUND

On March 5, 2001, Solomon was charged by complaint with one count of abuse of a family or household member, in violation of HRS § 709–906, *see supra* note 1, after he tied up his four-year-old nephew by the wrists and ankles to a bed or a tree and hit him with a belt.

On March 27, 2001, Solomon pled guilty to the charged offense. Prior to accepting Solomon's guilty plea, the family court conducted the following colloquy to determine whether Solomon's guilty plea was made knowingly, voluntarily, and intelligently:

THE COURT: .... Mr. Solomon, it's my understanding, sir, that you've decided to plead guilty to the charge of abuse of family household member this morning; is that correct, sir?

[SOLOMON]: Yes.

THE COURT: All right. Then let me ask you a few questions. How old are you?

[SOLOMON]: Forty-three.

THE COURT: And how much education do you have?

[SOLOMON]: Up to the tenth grade.

THE COURT: Are you under the influence of alcohol or any drugs this morning?

[SOLOMON]: No.

THE COURT: You understand the maximum penalty in this case is one year in jail and a $2,000 fine?

[SOLOMON]: Yes.

THE COURT: Also you understand you have the right to go to trial in this case, and by pleading guilty you give up certain rights you'd have if you went to trial?

[SOLOMON]: Yes.

THE COURT: Also you understand that if the [c]ourt imposes a sentence you do not agree with, you cannot at that time withdraw your guilty plea. You understand that?

[SOLOMON]: Yes.

THE COURT: Has anybody threatened or coerced you to plead guilty in this case?

[SOLOMON]: No.

THE COURT: So you're doing so of your own free will; is that correct?

[SOLOMON]: Yes.

THE COURT: Are you satisfied with the advice of your attorney?

[SOLOMON]: Yes.

THE COURT: All right. I'll ask for a statement of facts from the [prosecution].

Following a brief factual synopsis from the prosecution, Solomon again entered a guilty plea. Finding that Solomon "voluntarily entered his plea of guilty with an understanding of the nature of the charge against him and the consequences of his plea[,]" the family court accepted Solomon's guilty plea and adjudged him guilty.

After adjudging Solomon guilty, the family court immediately commenced sentencing proceedings. During the proceedings, the prosecution asked the family court to order a presentence investigation, and requested that Solomon be sentenced to a three-day jail term, as agreed. Defense counsel also requested that Solomon receive a three-day jail sentence, but urged the family court to credit Solomon for time already served. Defense counsel, however, deferred all other conditions of Solomon's sentence to the presentence investigation recommendation. The family court thereafter credited Solomon for time served and informed the parties that Solomon would not serve any additional period of incarceration. The family court, however, continued sentencing until May 4, 2001 to afford the probation department sufficient time to prepare a presentence investigation report to assist the court in determining the appropriate terms and conditions for Solomon's sentence.

On May 4, 2001, the family court heard arguments to determine the terms and condi-

tions of Solomon's sentence. The arguments, however, were made in the absence of a presentence investigation report because Solomon "was not aware that he was supposed to initiate the contact with the—with the [probation officer]." At the hearing, the prosecution requested one year probation, with the conditions that Solomon undergo "[domestic violence intervention], parenting [classes], mental health assessment and treatment, and sex offender evaluation and treatment but not registration." In support of its position that Solomon undergo sex offender evaluation and treatment, the prosecution explained that

> [t]he sex offender evaluation and treatment seems to be the major stumbling block, Your Honor. The [d]efense may argue that it's unwarranted by the facts of this matter. However, this was a four-year-old child who was bound to, depending on whose account, a bed or a tree and hit with a belt. There's an unmistakable bondage-type element here that the [prosecution] would argue at least needs to be evaluated and explored.
>
> If no treatment is deemed necessary, then that's fine. But the [prosecution] would ask this [c]ourt to take the prudent path and at least have the evaluation done to see if further treatment is necessary. Not to do so would—in light of what has already happened to one four-year-old boy, would be very difficult to explain should this happen again.
>
> The [prosecution] would argue that [Solomon] had an opportunity to go and have a presentence investigation conducted. If the presentence investigation had come back with sex offender evaluation and treatment not necessary, well the [prosecution's] grounds for asking for such would be much weaker. However, [Solomon] neglected to go into [the Adult Service Branch] and have the presentence investigation conducted.
>
> As such, the [prosecution] would argue that the [c]ourt should take the prudent path and perhaps even assume the worst in this matter and order the sex-the sex offender evalu—or the sex offender evaluation and treatment.

> Without the [presentence investigation], Your Honor, the [prosecution] would really be arguing that the [c]ourt should err on the side of caution in this matter as there is a binding and beating element of—a bondage-type element to this crime.

(Some formatting omitted.) Defense counsel, however, argued that the facts of the case did not warrant the imposition of sex offender evaluation and treatment as a condition of Solomon's probation and would amount to cruel and unusual punishment:

> Considering what's being asked here, the sex offender evaluation and treatment is a very rigorous and demanding program, Your Honor. Based on the mere facts alone that was presented in this case, the facts alone do not warrant such a condition of probation. And without any other indication more, I don't think that it's appropriate sentencing.
>
> It would be overly—the sentence in this case would be extremely unfair and possibly a violation of his [eighth a]mendment rights, Your Honor, because the facts in this case—just the mere fact that it's a four-year-old child—that was possibly tied at the wrists, Your Honor, that doesn't indicate a sex offender—sexual predator here.
>
> And I realize the [c]ourt's concern with the possibility of that. But because there is concern and because it's just a mere possibility, I think the [presentence investigation] would be critical in this case if the [c]ourt were to impose such a condition. So we would be objecting-strenuously objecting to any kind of sex offender eval[uation] or treatment in this case.
>
> . . . .
>
> But as far as the sex offender eval[uation] and treatment-there's also nothing in his criminal history that would indicate that's necessary here. This is the very first abuse-type case. He has nothing—no other criminal convictions that would indicate that's the path that he's taking here, Your Honor.

After hearing the arguments presented, the family court ordered Solomon to pay $50.00 to the criminal injury compensation fund and sentenced him to one year probation, subject

to the special conditions that he undergo domestic violation intervention counseling, parenting classes, sex offender evaluation and treatment, if necessary, and mental health assessment and treatment, if necessary:

> The presentence investigation was something that was the responsibility of [Solomon] to follow up on. I haven't received any evidence that there was any sort of particular fettered communication. I haven't heard anything from the public defender that was involved in this case. There has been no evidence that's been presented to the [c]ourt, other than the opinion of counsel, this would be an overly rigorous or costly procedure.

> There were concerns on the part of the [c]ourt about the possibility of the issues involving sex offender perhaps being involved. And those concerns have not been lessened by the fact that there's been no presentence investigation, apparently no coordination with the public defender's office. And now, even after this matter was set for hearing, there hasn't been what I would consider to be an adequate explanation as to why the presentence investigation did not take place.

> I know that [defense counsel] is an able attorney and has skills of communication that generally I would think would be adequate to inform Mr. Solomon about his need to contact the probation office. But certainly before coming to court today, the public defender's office could have been able to contact either the probation office or [defense counsel] to find out more facts.

> So based on these circumstances, I am going to order the sex offender evaluation and treatment. However, because Mr. Solomon has taken responsibility for this matter, the [c]ourt would not be imposing any additional period of incarceration. Although the facts—were you not to recognize the fact that you have violated the law and recognize your unlawful conduct, the [c]ourt would be inclined to give you more incarceration, Mr. Solomon.

> I understand you have an attachment to your nephew. It may well be that you're able to be returned to the relationship with your nephew at some point. And it may be that this sex offender evaluation and treatment helps you in that regard to be able to be reunited with him.

> In the event that for some reasons it does appear overly rigorous or costly, the public defender's office does have the option to file a motion for reconsideration. But if that was done, it certainly should be done with some facts and some consultation with a probation officer.

> So the [c]ourt will impose the following sentence of one year probation. General conditions of probation to apply which would be no possession or ownership of firearms during that period of time. Special conditions of domestic violence intervention counselling [sic], and parenting also to be ordered. A sex offender evaluation and treatment will be ordered as well as mental health assessment and treatment.

> . . . .

> A $50[.00] criminal injury compensation fee should be paid within 60 days. I'll waive the $75[.00] probation fee in this case.

On May 23, 2001, Solomon filed a motion for reconsideration of his sentence, urging the family court to eliminate the special condition that he undergo sex offender evaluation and treatment. In support of his position, Solomon argued that sex offender treatment was not "reasonably related" to the charged offense, in violation of HRS § 706-624(2) (1993), or his criminal history, in violation of HRS § 706-606(2) (1993). Solomon further argued that the family court's imposition of sex offender evaluation and treatment as a condition of his probation constituted cruel and unusual punishment, in violation of article I, section 12 of the Hawai'i Constitution and the eighth amendment to the United States Constitution, because "it severely stigmatize[d him]" and was unduly burdensome.

On June 18, 2001, the family court held a hearing on Solomon's motion for reconsideration of sentence. At the beginning of the hearing, the family court expressed its inclination to grant Solomon's motion. The prosecution, thereafter, argued that Solomon's

actions of tying up his nephew and hitting him with a belt imparted a "distinct bondage-type flavor[.]" The prosecution further explained that "the [Child Protective Services (CPS)] investigation into this matter did note that there had been prior allegations of sexual misconduct on the part of [Solomon]." In addition, the prosecution noted that Solomon was previously convicted for sexual assault in the fourth degree on October 3, 1991. In light of the evidence, the prosecution argued that

[a]t this point getting the assessment and treatment would only serve to benefit perhaps himself and no doubt his family. The CPS report indicates quite strongly the possibility that, if the mother were to retain custody of her children, that [Solomon] in the future would have contact with them, quite possibly unsupervised contact with the children. The [prosecution] finds that, quite frankly, a horrific possibility.

[The prosecution] would also note in terms of the current allegations and the bondage-type discipline which Mr. Solomon engaged in, he has in the past apparently also engaged in other bondage-type activities including handcuffing his daughter to a lawn chair to keep her from violating curfew. The [prosecution] would urge this [c]ourt to reconsider if it is thinking of allowing Mr. Solomon to dispose of the sex offender treatment.

This is not a call for registration which the [d]efense might argue would carry the stigma or some type of onerous public ridicule regarding his sexual offender status. This is just an assessment which could lead to possible treatment. At minimum, if the assessment were to come back negative, would not require some classes, would not require him to go further but just in terms of safety, we'd be sure that the complainant and other children in this matter would be safe. It seems that the sexual—the sexual assessment and treatment, if it's deemed necessary, would be justified in this case.

(Some formatting omitted.) In response to the prosecution's argument regarding Solomon's previous conviction of sexual assault in the fourth degree, defense counsel explained that Solomon pled guilty to the sexual assault

charge, and, unlike the instant case, "the complaining witness was [ ] one that Mr. Solomon was not familiar with. But she was approximately in her 40's. So it was not a young child."

The family court, thereafter, informed the parties that it would reconsider that part of Solomon's sentence requiring sex offender evaluation and treatment "given the lack of facts (inaudible) and the additional burden that it places on [Solomon] which the [c]ourt was not specifically aware of at the time." Based on the family court's decision, the prosecution proposed that the family court order a presentence investigation to address whether it would be appropriate to sentence Solomon to sex offender evaluation and treatment in light of the information provided in CPS reports the prosecution was in receipt of and the prosecution's concern for the welfare of the minor children involved:

[The prosecution] would note this [CPS] intake is being generated due to alleged sexual harm to [Solomon's four-year-old niece] by [Solomon]. On June 16th, 2001, [Solomon's four-year-old niece] reported to her 29-year-old father, [ ], during a supervised visit that Uncle James Solomon had been touching her down there, pointing to her genital area, while he gave her baths. Minor stated, "I don't like that."

When the active CPS investigator followed up with [Solomon's four-year-old niece] she] stated that she did not like Uncle James bathing her. "I don't want to go there," referring to [Solomon's] home. She cried and appeared really frightened. [Solomon's] actions appeared to be sexually motivated. Complainant assessed the child to be credible. Specific in this factor as to [Solomon's four-year-old niece's] disclosure is unknown.

Confirm CPS proof of sexual abuse is serious reservations to his own children when [Solomon's eight-year-old son], and nine-year-old [daughter], by her uncle, due to alleged anal penetration there were concern of no supporting medical evidence. Inconsistent statements by [Solomon's eight-year-old son]. And [Solomon] had passed the polygraph test.

However, the then-investigator, Ian Young, also noted that he assessed [Solomon's eight-year-old son] incredible and that his inconsistent statement may be attributed to [his] low cognitive functioning. In 1990 [Solomon] handcuffed his own daughter [ ] to a lawn chair in order to prevent her from violating curfew.

According to another report, [Solomon] knowingly allowed his own son [ ] to remain with maternal aunt, [ ], who burnt his eyelashes and hair. In conjunction, [Solomon] failed to protect his own daughter [ ] who had been sexually abused by [maternal aunt's husband], who currently lives with the family.

After admonishing the prosecution for failing to supply the CPS information in response to Solomon's motion for reconsideration of sentence, the family court continued the hearing on Solomon's motion for reconsideration to provide the probation officer an opportunity to review the CPS materials and prepare a report and recommendation as to whether sex offender evaluation was necessary.

On August 6, 2001, Robert R. Tangonan (Tangonan), probation supervisor, filed a letter addressed to Judge Wilson of the family court and attached (1) a "psycho-sexual assessment" report prepared by Joseph Giovannoni (Giovannoni), a certified clinical specialist in psychiatric and mental health nursing and a certified sex therapist, and (2) a polygraph examination report prepared by Michael Orian (Orian). In the psycho-sexual assessment report, Giovannoni first noted that Solomon was convicted of sexual assault in the fourth degree in 1991 and did not undergo a psycho-sexual assessment until May 12, 1993, at which time Solomon "admitted to exposing his genitalia to an adult female." Solomon subsequently began a relapse prevention group but was terminated for noncompliance. After summarizing Solomon's history, Giovannoni posed a series of questions to Solomon and scored his responses. Based on Solomon's score and polygraph results, Giovannoni assessed that

Mr. S[o]lomon is an untreated sex offender who has not complied with treatment in the past and who is likely to make excuses

in order to avoid treatment at the present time. I had an appointment with him on May 24, 2001 and he canceled it.

Mr. S[o]lomon was deceptive on the polygraph suggesting that he continues to engage in sexually abusive behavior. The polygraph suggests that the abuse has escalated to hands on abuse and that both his niece and his nephew are victims of his sexual abuse. Mr. S[o]lomon is super optimistic that he can circumvent the system as he believes he did in 1993.

The salient events to which he admits to tying up his nephew suggests sadistic tendencies. Mr. S[o]lomon's affect demonstrates no remorse. He justifies and excuses his actions. He is at risk of being violent, sadistic, and likely to sexually exploit children. His present girlfriend enables him and does not believe that he has [a] sexual problem. Therefore she is likely to overlook any children he may be grooming to sexually abuse. Mr. S[o]lomon's motivation for treatment is poor and he poses a risk to children, especially those who are in his extended family.

Giovannoni thus recommended that Solomon "participate in a sex offender program until he completes the objectives of relapse prevention treatment and he is clinically discharged."

In the polygraph examination report, Orian first noted that, during his interview with Solomon, Solomon stated that he was discharged from the army "because he grabbed a high school girl while he was in the [a]rmy and stationed in Germany." Orian then noted that, during the polygraph examination, Solomon answered "no" to the following questions: (1) Since 1993, did you ever expose yourself to anyone in public?; (2) Did you ever touch or put your hand on your niece's vagina?; (3) Since 1993, did you ever put your hand, mouth or penis on any minor girl's breast, vagina or buttocks?; and (4) Did you ever do anything sexual with your nephew? Orian reported that, based on Solomon's responses, Solomon "[was] being completely deceptive." When Solomon was informed that he displayed deceptive responses, Solomon admitted "that since 1993, he has sat in his car and masturbated while

looking at girls at the beach or at a park." Solomon, however, explained that "the girls were away from his car, never saw his penis, and did not see him masturbating[,]" and that he did not have any sexual activity or contact with any minor child, including his niece and nephew.

Accordingly, based on Giovannoni's psycho-sexual assessment report and the polygraph examination results, Tangonan informed Judge Wilson that "[Solomon] should be supervised by the Special Services Section that includes specialized supervision of sex abuse defendants that requires sex therapy; close monitoring and supervision, more random drug testing for mood altering drugs including alcohol and polygraph testing to monitor his compliance to the treatment plan and the conditions of probation."

■ On August 6, 2001, the parties returned to family court for further proceedings on Solomon's motion for reconsideration. Based on Giovannoni's and Orian's reports, the family court denied Solomon's motion for reconsideration and maintained its imposition of sex offender evaluation and treatment as a condition of Solomon's sentence:

> All right. Mr. Solomon, as you can see, the [c]ourt has—we've invested a lot of time in taking a look at your case. And I am sensitive to the fact that the sex offender treatment would be something that would involve a lot of effort on your part.
>
> On the other hand, this is a case in which there was no period of incarceration imposed, and it's a—it's a sentence that takes into consideration that there were certain facts about this case that also involved the tying up a juvenile that made the [c]ourt consider the concept of sex offender treatment.
>
> The further evaluation that has been done in this case by Dr. Giovannoni has confirmed that the condition that was originally imposed as part of your sentence, that is, sex offender evaluation and treatment, would be appropriate.

> I can only recommend to you that you keep in mind that this is a misdemeanor case for which you would be sentenced as a condition of your probation to undergo this treatment, and then it's finished. When your probation is finished, then that will be the end of your treatment.
>
> This is not something that is a lifetime matter. You are not being told to register as a sex offender. This is a misdemeanor case, the conditions of which for your sentencing include the sex offender treatment.
>
> However, that is an important difference, between being convicted of a sexual offense and having to register as a sex offender for the State. So I don't want you to misunderstand the situation.
>
> Also, the treatment that is to be provided to you to the extent that this is something that hopefully will help you with your—the way you approach the treatment, this treatment is being done for your own good. This isn't treatment that's being done to, you know, punish [James] Franklin Solomon. It's also being done of course to protect other people that you'll come into contact with, but it is important for you to remember that it is something that's meant for your benefit.
>
> If you complete it successfully, it's behind you; and that's it. So it's very important—the reason I'm saying this, it's very important for you to have the right attitude for you to be able to benefit from this. So just try to keep that in mind.
>
> All right. So the motion for reconsideration is denied in this case. I do see that there's an adequate nexus in the facts and also, given the report of the expert, an adequate nexus for the imposition of the sex offender treatment as a condition of sentencing.

Solomon thereafter appealed.[4]

## II. STANDARD OF REVIEW

### A. Plain Error

■ "We may recognize plain error when the error committed affects substantial

4. Under Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b)(1), a notice of appeal must be filed "within 30 days after the entry of the judg-

ment or order appealed from." In the instant case, Solomon filed his notice of appeal on August 13, 2001—seven days after the family court

rights of the defendant." *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (citations and internal quotation marks omitted).

## B. Confession of Error

■ When the prosecution concedes error, it is incumbent on the appellate court first to ascertain that the confession of error is supported by the record and well-founded in law and second to determine that such error is properly preserved and prejudicial. In other words, a confession of error by the prosecution is not binding upon an appellate court, nor may a conviction be reversed on the strength of the prosecutor's official action alone.

*State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (citations, internal quotation marks, ellipsis points, and brackets omitted).

## C. Acceptance of a Guilty Plea

■ A trial judge is constitutionally required to ensure that a guilty plea is voluntarily and knowingly entered. Although no specific dialogue is required, the court should make "an affirmative showing by an on-the-record colloquy between the court and the defendant wherein the defendant is shown to have a full understanding of what the plea of guilty connotes and its consequences."

*State v. Williams*, 68 Haw. 498, 499, 720 P.2d 1010, 1012 (1986) (citations and emphasis omitted).

## D. Sentencing

■ [A] sentencing judge generally has broad discretion in imposing a

sentence. *State v. Gaylord*, 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995); *State v. Valera*, 74 Haw. 424, 435, 848 P.2d 376, 381 (1993). The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. *Gaylord*, 78 Hawai'i at 144, 890 P.2d at 1184; *State v. Kumukau*, 71 Haw. 218, 227–28, 787 P.2d 682, 687–88 (1990); *State v. Murray* [,] 63 Haw. 12, 25, 621 P.2d 334, 342–43 (1980); *State v. Fry*, 61 Haw. 226, 231, 602 P.2d 13, 16 (1979).

*Keawe v. State*, 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995). "[F]actors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions." *Fry*, 61 Haw. at 231, 602 P.2d at 17. And, " '[g]enerally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.' " *Keawe*, 79 Hawai'i at 284, 901 P.2d at 484 (quoting *Gaylord*, 78 Hawai'i at 144, 890 P.2d at 1184 (quoting *Kumukau*, 71 Haw. at 227–28, 787 P.2d at 688)).

*State v. Kaua*, 102 Hawai'i 1, 7, 72 P.3d 473, 479 (2003) (quoting *State v. Rauch*, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000)) (brackets and ellipsis points in the original).

## E. Questions of Constitutional Law

■ "We answer questions of constitutional law by exercising our own independent

denied his motion for reconsideration of sentence. Disposition of a motion for reconsideration of sentence, however, "does not qualify under HRAP Rule 4(b) as a tolling motion that extends the filing deadline for a notice of appeal." *State v. Naone*, 92 Hawai'i 289, 300, 990 P.2d 1171, 1182 (App.1999). Notwithstanding, a trial court has authority to "extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision (b)." HRAP Rule 4(b)(5). However, because the family court granted Solomon a seventy-day extension within which to file his notice of appeal, Solomon's notice of appeal was untimely.

Nevertheless, this court has recognized that a criminal defendant

is entitled, on his first appeal, to effective counsel who may not deprive him of his appeal by failure to comply with procedural rules, ... such as [HRAP] Rule 4(b), which requires that the notice of appeal be filed within thirty days after the entry of the judgment or order appealed from.

*State v. Aplaca*, 96 Hawai'i 17, 23, 25 P.3d 792, 798 (2001) (citations and internal quotation marks omitted). Therefore, because Solomon is asserting his first appeal, and his failure to file a timely notice of appeal seems to be the result of his attorney's failure to comply with HRAP [Rule] 4(b), Solomon should not be deprived of his appeal.

judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the right/wrong standard." *State v. Peseti,* 101 Hawai'i 172, 178, 65 P.3d 119, 125 (2003) (citing *Aplaca,* 96 Hawai'i at 22, 25 P.3d at 797) (internal quotation marks and citation omitted).

## III. DISCUSSION

**A. The family court's failure to establish on the record that Solomon's guilty plea was knowing and voluntary constituted an abuse of discretion amounting to plain error.**

■ On appeal, Solomon argues that the family court's acceptance of his guilty plea without an affirmative showing that he voluntarily, intelligently, and knowingly pled guilty constituted an abuse of discretion amounting to plain error. Solomon specifically contends that the family court failed to: (1) advise him that "by pleading guilty, he was specifically waiving his right against self-incrimination and his right to confront his accusers[;]" (2) advise him that he had a right to a trial by jury; (3) inquire whether his "willingness to plead guilty was a result from a plea agreement as required by [Hawai'i Rules of Penal Procedure (HRPP)] Rule 11(d)[;]" and (4) inform him that it was not bound by the plea agreement. Solomon thus maintains that the family court's failure to ascertain that he understood the specific consequences of his guilty plea was plain error. The prosecution concedes that the record is insufficient to show that Solomon's guilty plea was knowing and voluntary, and, therefore, requests that this court vacate Solomon's conviction and remand for a new change of plea hearing or for resentencing by another court. Inasmuch as the record fails to affirmatively demonstrate that Solomon knowingly, voluntarily, and intelligently pled guilty, the family court's acceptance of Solomon's guilty plea was plain error.

This court has acknowledged that, "even when the prosecutor concedes error, . . . it is incumbent on the appellate court first to ascertain . . . that the confession of error is supported by the record and well-founded in law and second to determine that such error is properly preserved and prejudicial."

*Hoang,* 93 Hawai'i at 336, 3 P.3d at 502 (internal brackets, quotation marks, and citations omitted) (some ellipsis points in the original and some added). "In other words, a confession of error by the prosecution is not binding upon an appellate court, nor may a conviction be reversed on the strength of the prosecutor's official action alone." *Id.* (internal quotation marks, brackets, and citation omitted).

■ It is well-recognized that a guilty plea "in itself is a conviction and a simultaneous waiver of several important constitutional guarantees[,]" namely, the privilege against compulsory self-incrimination, the right to a trial by jury, and the right to confront one's accusers, and, thus, the waiver of these guarantees "is not constitutionally acceptable unless made voluntarily and with full understanding of the consequences." *Wong v. Among,* 52 Haw. 420, 425, 477 P.2d 630, 634 (1970). Generally, therefore, "[a] trial judge is constitutionally required to ensure that a guilty plea is voluntarily and knowingly entered." *Williams,* 68 Haw. at 499, 720 P.2d at 1012 (citations and emphasis omitted). In determining the voluntariness of a defendant's proffered guilty plea, the trial court "should make an affirmative showing by an on-the-record colloquy between the court and the defendant wherein the defendant is shown to have a full understanding of what the plea of guilty connotes and its consequences." *State v. Vaitogi,* 59 Haw. 592, 602, 585 P.2d 1259, 1265 (1978). It is plain error for the trial judge to accept a defendant's guilty plea without an affirmative showing that it was intelligent and voluntary. *Id.* at 601–02, 585 P.2d at 1264–65.

Additionally, when a trial court accepts a guilty plea, HRPP Rule 11 requires the court to first address the defendant personally in open court and then determine that the plea is voluntary:

> (c) *Advice to defendant.* The court shall not accept a plea of guilty or nolo contendere without first addressing the defendant personally in open court and determining that he understands the following:
>
> (1) the nature of the charge to which the plea is offered; and

(2) the maximum penalty provided by law, and the maximum sentence of extended term of imprisonment, which may be imposed for the offense to which the plea is offered; and

(3) that he has the right to plead not guilty, or to persist in that plea if it has already been made; and

(4) that if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and

(5) that if he is not a citizen of the United States, a conviction of the offense for which he has been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.

(d) *Insuring that the plea is voluntary.* The court shall not accept a plea of guilty or nolo contendere without first addressing the defendant personally in open court and determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from any plea agreement.

HRPP Rule 11(c), (d). Moreover, if a defendant enters a guilty plea pursuant to a plea agreement, it is incumbent upon the trial court to inform the defendant that it is not bound by the plea agreement. HRPP Rule 11(e)(3) ("Upon disclosure of any plea agreement, the court shall not accept the tendered plea unless the defendant is informed that the court is not bound by such agreement, unless the court agreed otherwise.").

In the instant case, the family court accepted Solomon's guilty plea without an affirmative showing that Solomon had a full and complete understanding of what his guilty plea connoted and its consequences. Although the family court conducted an on-the-record colloquy with Solomon prior to accepting his plea and advised him that "you have the right to go to trial in this case, and by pleading guilty you give up *certain rights* you'd have if you went to trial[,]" (emphasis added), the family court did not explain the specific rights Solomon would "give up" by pleading guilty. Specifically, the family court did not ascertain whether Solomon understood that by pleading guilty, he was waiving his privilege against self-incrimination, the right to a trial by jury, and the right to confront his accuser. In addition, the family court failed to (1) inquire whether Solomon's willingness to plead guilty was the result of a plea agreement, *see* HRPP Rule 11(d), and (2) inform Solomon that it was not bound by the plea agreement, *see* HRPP Rule 11(e)(3). Thus, Solomon's guilty plea was not made knowingly, intelligently, and voluntarily.

Inasmuch as the record affirmatively demonstrates that Solomon did not have a full and complete understanding of what his guilty plea connoted and its consequences, the family court's acceptance of Solomon's guilty plea constituted an abuse of discretion amounting to plain error. Accordingly, we vacate Solomon's conviction and remand the case to the family court for a new change of plea hearing.

**B. The family court did not abuse its discretion in sentencing Solomon to undergo sex offender evaluation and treatment, if necessary, as a condition of his probation.**

■ Solomon further argues that the family court abused its discretion in sentencing him to sex offender evaluation and treatment as a condition of his probation. Solomon specifically contends that the family court's sentence ordering him to undergo sex offender evaluation and treatment was illegal because he did not commit a sexual offense and it was not reasonably related to his character and history. In addition, Solomon alleges that the family court deprived him of liberty because no evidence was presented suggesting the need for sex offender evaluation and treatment. We disagree.

"The legislature prescribes penalties for criminal offenses and its inclination has been to vest in the courts 'wide latitude in the selection of penalties from those prescribed and in the determination of their severity.' " *Kumukau,* 71 Haw. at 224, 787 P.2d at 686

(quoting *State v. Johnson,* 68 Haw. 292, 296, 711 P.2d 1295, 1298 (1985)). "In determining the particular sentence to be imposed, the court must consider a variety of factors in exercising its discretion in fitting the punishment to the crime 'as well as the needs of the individual defendant and the community.' " *Id.* at 225, 787 P.2d at 686–87 (quoting *State v. Teves,* 4 Haw.App. 566, 573, 670 P.2d 834, 838 (1983)).

"Abuse of a family or household member [is a] misdemeanor." HRS § 709–906(5). Under HRS § 709–906(5)(a), a person convicted for the first time of abuse of a family or household member "shall serve a minimum jail sentence of forty-eight hours[.]" Moreover, pursuant to sentencing guidelines, a sentencing court *may* sentence a defendant convicted of abuse of a family or household member "to imprisonment for a definite term to be fixed by the court and not to exceed one year in the case of a misdemeanor[.]" HRS § 706–663. Notwithstanding, within the range of discretion that the Hawaiʻi Penal Code affords courts in imposing sentences, a sentencing court may also sentence a defendant convicted of abuse of a family or household member to probation, rather than imprisonment.[5] HRS § 706–620 (Supp.2004). Once a probation sentence is imposed, a defendant must comply with the mandatory and discretionary conditions set by the sentencing court. HRS § 706–624 (1993).

A sentencing court's authority to impose conditions on a term of probation is statutorily prescribed under HRS § 706–624. Not-

withstanding the mandatory conditions of probation, a sentencing court may, in its discretion, impose additional conditions that are reasonable:

> The court may provide, as further conditions of a sentence of probation, *to the extent that the conditions are reasonably related to the factors set forth in section 706–606 and to the extent that the conditions involve only deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 706–606(2),* that the defendant:
>
> (a) Serve a term of imprisonment ... not exceeding six months in misdemeanor cases; ....
>
> ....
>
> (k) Undergo available medical, psychiatric, or psychological treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;
>
> ....
>
> (n) Satisfy other reasonable conditions as the court may impose[.]

HRS § 706–624(2) (emphasis added). A sentencing court, therefore, must consider the following factors when imposing additional probationary conditions:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed:
>
>> (e) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime;
>> (f) The defendant's criminal conduct was the result of circumstances unlikely to recur;
>> (g) The character and attitudes of the defendant indicate that the defendant is unlikely to commit another crime;
>> (h) The defendant is particularly likely to respond affirmatively to a program of restitution or a probationary program or both;
>> (i) The imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents; and
>> (j) The expedited sentencing program set forth in section 706–606.3, if the defendant has qualified for that sentencing program.
>
> HRS § 706–621 (1993).

---

5. In determining whether to impose a term of probation, the sentencing court is guided by the following factors:

> (1) The factors set forth in section 706–606 to the extent that they are applicable;
> (2) The following factors, to be accorded weight in favor of withholding a sentence of imprisonment:
>> (a) The defendant's criminal conduct neither caused nor threatened serious harm;
>> (b) The defendant acted under a strong provocation;
>> (c) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;
>> (d) The victim of the defendant's criminal conduct induced or facilitated its commission;

(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

(b) To afford adequate deterrence to criminal conduct;

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available; and

(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

HRS § 706–606 (1993).

In the instant case, Solomon was convicted of abuse of a family or household member after he pled guilty to tying up his four-year-old nephew by the wrists and ankles, and hitting him with a belt. The family court therefore had discretion to sentence Solomon to probation, subject to mandatory and discretionary conditions. The family court subsequently sentenced Solomon to one year probation subject to the condition that he, *inter alia*, undergo sex offender evaluation and treatment. In imposing sex offender evaluation and treatment as a condition of Solomon's probation, the scope of the family court's inquiry must ensure that this condition was "reasonably related to the factors set forth in [HRS § ] 706–606 and to the extent that [it] involve[d] only deprivations of liberty or property as are reasonably necessary for the purposes indicated in [HRS § ] 706–606(2)[.]" HRS § 706–624(2). Although the record demonstrates that the family court initially lacked information regarding Solomon's need for sex offender treatment at the time of his sentencing because of the absence of a presentence report, the family court nevertheless had sufficient information after considering Solomon's motion for reconsideration of his sentence.[6] Specifically, the

6. This court recently held that the imposition of a consecutive sentence based on alleged but uncharged misconduct constituted plain error in *State v. Vellina*, 106 Hawai'i 441, 449–50, 106 P.3d 364, 372–73 (2005). In *Vellina*, the circuit court sentenced Vellina to consecutive terms of imprisonment based on the prosecution's allegation that he "sold" a semi-automatic firearm he stole during a burglary to a drug dealer in exchange for drugs:

> At Vellina's sentencing hearing, the deputy prosecuting attorney (DPA) argued for the imposition of consecutive sentences based upon the DPA's claim that Vellina had "sold those firearms to a drug dealer for drugs." The DPA offered no proof to substantiate his allegation that Vellina had sold the semi-automatic rifle that he stole to a "drug dealer." The circuit court likewise did not question the DPA regarding the basis for his belief that Vellina had sold the firearm to a drug dealer.
>
> In sentencing Vellina, the circuit court stated, "Now, when I hear that ... some drug dealer now has ... an illegal semi-automatic weapon that you stole and transferred to him, I mean, that's pretty damaging to the community." The circuit court proceeded to sentence Vellina, "taking into consideration ..., particularly, the need to make an example of this kind of behavior to the community and to promote community safety," to consecutive terms of imprisonment totaling twenty years.

*Id.* at 449–50, 106 P.3d at 372–73. Vellina subsequently appealed his sentence, arguing that the imposition of consecutive terms of imprisonment based upon uncharged misconduct alleged by the prosecution at sentencing was plain error. *Id.* at 449, 106 P.3d at 372. This court agreed. Reaffirming the mandate set forth in *State v. Nunes*, 72 Haw. 521, 824 P.2d 837 (1992), that "a judge cannot punish a defendant for an uncharged crime in the belief that it too deserves punishment[,]" *id.* at 526, 824 P.2d at 840, this court held that the circuit court "clearly exceeded the bounds of reason in sentencing Vellina[ ]" because the record failed to provide any evidence that Vellina actually transferred a semi-automatic firearm to a drug dealer in exchange for drugs as relied upon by the circuit court in sentencing Vellina as it did:

> [T]he circuit court unquestionably determined that Vellina had "transferred" the semi-automatic firearm to a drug dealer and sentenced him with that in mind. Similar to *Nunes*, the circuit court imposed punishment for uncharged crimes-possibly either transfer and possession of firearms, pursuant to HRS § 134–4 (1993), or the prohibited transfer of firearms, pursuant to HRS § 134–8 (1993). *Id.* at 526, 824 P.2d at 840. We see nothing in the record to support the circuit court's conclusion that Vellina transferred a semi-automatic firearm to a drug dealer. Indeed, a presentence investigation report was not even prepared for the present matter.

*Vellina*, 106 Hawai'i at 450, 106 P.3d at 373. As such, this court held that "the circuit court plainly erred in sentencing Vellina to consecutive terms of imprisonment based on the unsubstantiated allegation that he had transferred the semi-automatic firearm to a drug dealer." *Id.*

family court learned that: (1) Solomon had a prior conviction of sexual assault in the fourth degree; (2) a CPS report noted that (a) Solomon previously engaged in "handcuffing his daughter to a lawn chair to keep her from violating curfew[,]" and (b) Solomon's four-year-old niece reported that he inappropriately touched her genital area while giving her a bath; (3) Solomon admitted during his polygraph examination that (a) he was discharged from the army "because he grabbed a high school girl while he was in the [a]rmy and stationed in Germany[,]" and (b) "since 1993, he has sat in his car and masturbated while looking at girls at the beach or at a park[;]" and (4) a "psycho-sexual assessment" concluded that (a) Solomon "is an untreated sex offender who has not complied with treatment in the past and who is likely to make excuses in order to avoid treatment at the present time[,]" (b) Solomon "was deceptive on the polygraph suggesting that he continues to engage in sexually abusive behavior [and] the abuse has escalated to hands on abuse and that both his niece and his nephew are victims of his sexual abuse[,]" and (c) Solomon "is at risk of being violent, sadistic, and likely to sexually exploit children[.]" Based on Solomon's history, the circumstances of this case, and the seriousness of the offense, we cannot say that the family court exceeded the bounds of reason or disregarded rules or principles of law to the substantial detriment of Solomon when it sentenced him to undergo sex offender evaluation and treatment as a condition of his probation. Accordingly, the family court did not abuse its discretion in sentencing Solomon as it did.

**C. The family court's imposition of sex offender evaluation and treatment as a condition of Solomon's sentence did not constitute cruel and unusual punishment.**

■ As a final note, Solomon argues that the family court's imposition of sex offender

evaluation and treatment as a condition of his sentence constituted cruel and unusual punishment, in violation of the eighth amendment to the United States Constitution, *see supra* note 2, and article I, section 12 of the Hawai'i Constitution, *see supra* note 3. Solomon specifically maintains that the imposition of sex offender evaluation and treatment was manifestly cruel and unusual, inasmuch as (1) he was not convicted of a sex offense, (2) he was not a danger to the public, (3) he would be severely stigmatized, and (4) it deviated from sentences imposed upon other individuals convicted of abuse of a family or household member. We disagree.

■ This court addresses arguments of cruel and unusual punishment pursuant to the following standard:

"The standard by which punishment is to be judged under the 'cruel and unusual' punishment provisions of both the United States and Hawaii Constitutions is whether[,] in the light of developing concepts of decency and fairness, the prescribed punishment is so disproportionate to the conduct proscribed and is of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community."

*State v. Jenkins,* 93 Hawai'i 87, 114, 997 P.2d 13, 40 (2000) (quoting *Kumukau,* 71 Haw. at 226–27, 787 P.2d at 687 (quoting *State v. Freitas,* 61 Haw. 262, 267–68, 602 P.2d 914, 920 (1979))). " 'The question of what constitutes an adequate penalty necessary for the prevention of crime is addressed to the sound judgment of the legislature and the courts will not interfere with its exercise, unless the punishment prescribed appears clearly and manifestly to be cruel and unusual.' " *Id.* at 114, 997 P.2d at 40 (quoting *Freitas,* 61 Haw. at 267, 602 P.2d at 920). In determining whether a punishment is "clearly and manifestly" cruel and unusual, this court, in *Freitas,* borrowed a three-pronged test set forth

In distinct contrast to *Vellina,* the record in the instant case aptly supported the family court's sentence. Specifically, the record included a "psycho-sexual assessment report," a polygraph examination report, and testimony confirming Solomon's sexually abusive behavior and the likelihood of Solomon sexually exploiting young

children. Accordingly, unlike *Vellina,* when the family court sentenced Solomon to undergo sex offender evaluation and treatment as a condition of his probation, substantial evidence existed in the record to support Solomon's history of sexual misconduct.

in *In re Lynch*, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1972), *superseded by statute on other grounds* by Cal.Penal Code §§ 1170 *et seq.*, which directs this court to consider

> (1) the nature of the offense and/or the offender, with particular regard to the degree of danger posed by both to society; (2) the extent of the challenged penalty as compared to the punishments prescribed for more serious crimes within the same jurisdiction; and (3) the extent of the challenged penalty as compared to the punishment prescribed for the same offense in other jurisdictions.

*Jenkins*, 93 Hawai'i at 114, 997 P.2d at 40 (quoting *Freitas*, 61 Haw. at 268, 602 P.2d at 920). "In using this test, the nature of the offense and the danger the offender poses to society are the key factors in this determination." *Id.* (internal quotation marks and citation omitted).

In the instant case, with regard to the first prong of the *Freitas/Lynch* test, the nature of Solomon's offense warranted the imposition of a strict penalty, especially because the victim was a child. The legislature's purpose in enacting a family abuse statute reflects Hawai'i's concern for the increasing frequency of family abuse and its impact upon children and the community:

> Your Committee is concerned with effectively addressing and combatting [sic] family violence. The ramifications of family violence spread far beyond the confines of the family. Children who are the victims of, or are witnesses to, violence learn to view it as accepted and normal behavior. They may perpetuate the violence as adults.
>
> .... Your Committee believes that extending the protection of this criminal statute to family and household members will assist in mitigating family violence and its effect on the community.

Sen. Conf. Comm. Rep. No. 6, in 1985 Senate Journal, at 848. *See also State v. Friedman*, 93 Hawai'i 63, 72, 996 P.2d 268, 277 (2000). As such, in order to prevent and deter the risk of harm to family members and the community, a person who abuses a family or household member could be imprisoned for as long as a year. Correlatively, on the record before the family court, Solomon's actions of binding his four-year-old nephew by his wrists and ankles and hitting him with a belt could also warrant a one-year term of probation subject to the condition that he undergo sex offender evaluation and treatment, if necessary.

With regard to the second prong of the *Freitas/Lynch* test, a person convicted of the more serious offense of endangering the welfare of a minor in the first degree may be sentenced to an extended indeterminate term of ten years' imprisonment and ordered to pay a $10,000 fine, or five years' probation. *See* HRS § 709–903.5(3) (1993) ("Endangering the welfare of a minor in the first degree is a class C felony."). Moreover, a person convicted of endangering the welfare of a minor child in the second degree may be sentenced to up to one year in jail and ordered to pay a $2,000 fine, or one year probation. *See* HRS § 709–904(3) (1993) ("Endangering the welfare of a minor is a misdemeanor."). Compared with the possibility of a ten-year jail term and a $10,000 fine, or five years' probation, Solomon's sentence of one-year probation subject to the condition that he undergo sex offender evaluation and treatment, if necessary, does not appear to be disproportionately onerous.

Finally, with regard to the third prong of the *Freitas/Lynch* test, a perusal of cases from other jurisdictions reveals that some states impose similar sentences upon persons convicted of physically abusing a family or household member. *See, e.g.*, Mont.Code Ann. § 45–5–206(3)(a)(i), (iii) (2003) (providing that a person convicted of assaulting a partner or family member shall be sentenced to not more than one-year imprisonment or be ordered into misdemeanor probation for the first or second conviction); N.H.Rev.Stat. Ann. § 639:3(V) (2003) (providing that endangering the welfare of a child is a misdemeanor). The statutory schemes from other states, however, mandate harsher sentences. *See, e.g.*, N.J. Stat. Ann. § 2C:24–4(a) (West 2001) (providing that a person convicted of harming a child under the age of sixteen shall be sentenced to a seven-year term of imprisonment); Nev.Rev.Stat.

§ 200.508(1)(b)(1) (2003) (mandating that a first-time offender convicted of physically or mentally abusing a child, which does not result in substantial bodily or mental harm, "shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 6 years"). By comparison, therefore, the extent of the family court's imposition of a one year term of probation, subject to the condition that Solomon undergo sex offender evaluation and treatment, is far less severe.

The family court had ample grounds on which to punish Solomon as ·it did. Inasmuch as the imposition of a one-year term of probation, subject to the condition that Solomon undergo sex offender evaluation and treatment, for tying up his four-year-old nephew by the wrists and ankles and hitting him with a belt (1) fell within the range of punishment prescribed by the applicable statutory provisions, (2) does not "shock the conscience" of reasonable persons, and (3) does not outrage the moral sense of the community, it was not cruel and unusual punishment for the family court to impose the sentence that it did. Accordingly, Solomon's sentence did not violate the eighth amendment to the United States Constitution or article I, section 12 of the Hawai'i Constitution.

## IV.   CONCLUSION

Based on the foregoing, we vacate the family court's May 4, 2001 order and remand the case to the family court for a new change of plea hearing.

